# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| INGRID FISHER, *et al.*, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-05-1731 |
| | § | |
| HALLIBURTON, *et al.*, | § | |
|     *Defendants*. | § | |

| | | |
|---|---|---|
| REGINALD LANE, *et al.*, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-1971 |
| | § | |
| HALLIBURTON, *et al.*, | § | |
|     *Defendants*. | § | |

| | | |
|---|---|---|
| KEVIN SMITH-IDOL, | § | |
|     *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-1168 |
| | § | |
| HALLIBURTON, *et al.*, | § | |
|     *Defendants*. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court are defendants' motions for summary judgment. *Fisher* Dkt. 319, *Lane* Dkt. 146, *Smith-Idol* Dkt. 105. Upon consideration of the motions, the responses, the replies, the summary judgment record, the argument of counsel, and the applicable law, the motions are GRANTED IN PART and DENIED IN PART as detailed below. Additionally, the court on its own motion finds that the question regarding the scope of the Defense Base Act's exclusivity provision merits immediate interlocutory appeal under 28 U.S.C. § 1292(b). Therefore, those cases of which this order does not dispose, are hereby STAYED pending a ruling by the Fifth Circuit on those issues

addressed by the court in Section I of this order.

BACKGROUND

The basic facts of this case have been outlined in many of the court's previous orders. At the simplest level, the facts are these: The defendants were awarded the contract by the United States Army to supply various aspects of civilian support for the United States Army effort in Iraq. The plaintiffs were hired through a nation-wide recruiting program to work for defendants driving fuel convoys. The plaintiff in *Smith-Idol* drove in the Hacklen convoy, which came under attack on April 8, 2004. The drivers in the *Fisher* plaintiffs' case were a part of the Hamill convoy, while the driver in the *Lane* plaintiffs' case drove for the Longstreet convoy. Both of these convoys came under attack on April 9, 2004. The details relevant to the question before the court on summary judgment will be discussed in the court's analysis.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token,

3

the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

ANALYSIS

## I.     The Defense Base Act

Congress enacted the Defense Base Act ("DBA"), 42 U.S.C. § 1651 *et seq.*, in 1941.  The DBA has few substantive provisions of its own.  Instead it incorporates the Longshore and Harbor Workers' Compensation Act (the "Longshore Act"), 33 U.S.C. § 901 *et seq.*, and its scheme of uniform workers' compensation to persons employed on defense projects overseas as defined by the act.  42 U.S.C. § 1651(a).  The Longshore Act was enacted as a humanitarian, remedial insurance scheme to provide uniform compensation for injuries sustained on the job for maritime workers not covered by the Jones Act.  H.R. REP. No. 69-1190, at 1, 3 (1926).  Like the Longshore Act, the DBA contains an exclusivity provision:

> The liability of an employer, contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this chapter shall be exclusive and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents) coming within the purview of this chapter, under the workmen's compensation law of any State, Territory, or other jurisdiction, irrespective of the place where the contract of hire of any such employee may have been made or entered into.

42 U.S.C. § 1651(c).  The issues before the court on this motion are twofold.  First, whether the plaintiffs' injuries fall within the scope of the act.  And second, whether and to what extent the exclusivity provision of the DBA bars all tort suits.

### 1.     Contentions of the Parties

#### A.     The Defendants' Arguments

The defendants argue that the DBA bars all of the plaintiffs' claims.  As a threshold matter,

4

they contend that the plaintiffs' negligence claims are expressly barred by the Act. Additionally, they urge that the scope of the DBA's exclusivity provision covers all of the plaintiffs' claims, including those for the alleged intentional torts and fraud. But, they argue that even if the exclusivity provision does not apply to some intentional torts, to achieve the policies underlying the DBA any exception for intentional torts should be exceedingly narrow—limited to "an actual, deliberate, purposeful, individuated intent to injure" the employee. Dkt. 319 at 36. They contend that Congress's policies underlying the Longshore Act were to provide workers with guaranteed recovery for injuries on the job while at the same time limiting employers' exposure to litigation. Defendants reason that because courts have difficulty determining the line between reckless negligence and intent premised on substantial certainty, any exception broader than the purposeful intent to injure standard they propose would encourage litigation and undermine one of the purposes of the Longshore Act. And, they conclude that the plaintiffs have not and likely cannot allege facts sufficient to create a genuine issue of material fact under this narrowly defined exception.

Furthermore, they contend that the DBA's exclusivity provision reaches far enough to encompass the plaintiffs' fraudulent inducement claims because the court would be forced to look at the actions of the defendants in Iraq—not just to the statements of the defendants prior to the plaintiffs' employment. *Id.* at 46 n. 23. Therefore, they move the court for summary judgment on all of the plaintiffs' remaining claims.[1]

### B. *The Plaintiffs' Arguments*

The *Fisher* and *Lane* plaintiffs' argument centers not around any exclusion to the DBA, but on the language of the statute itself. They argue that the DBA defines an injury as an accident and that

---

[1] All plaintiffs' RICO claims, and plaintiff Smith-Idol's § 1983 claims have already been dismissed by the court in its order of December 17, 2009. *Fisher* Dkt. 405, *Lane* Dkt. 218, *Smith-Idol* Dkt. 171.

the plain meaning of the term accident does not include conscious acts like the intentional torts alleged here. They argue that the Fifth Circuit has defined an accident as an unexpected event. And, they contend the summary judgment record amply illustrates that the events underlying the suit were anything but unexpected. Further, not only does the plain meaning support this interpretation, but also, they argue, the Supreme Court's instruction to courts to construe the Longshore Act, and thus the DBA, to avoid harsh and incongruous results supports excluding defendants' intentional acts from coverage.

Additionally, they contend that defendants' reliance on state court interpretations of state workers' compensation statutes is misplaced. First, the states' courts are divided regarding the level of intent necessary to fall under an intentional tort exception to workers' compensation statutes' exclusivity provisions—if indeed any exception exists. This lack of uniformity springs from the fact that different states use different definitions of intent for their various common law intentional torts. And second, state law interpretations over the last fifty years do not bear on Congress's intent in enacting the Longshore Act in 1927. To interpret a statute properly, the court should look only to cases and an understanding of the coverage of the act contemporaneous to the passage of the Longshore Act.

The plaintiff in *Smith-Idol* begins by arguing that the DBA cannot apply to his claim for fraudulent inducement, because the claim arises from actions taken before the employment relationship existed and occurred in the United States. Regarding the other claims, plaintiff contends that the DBA does not apply to intentional torts. Intent may be illustrated by circumstantial evidence, and the jury may infer intent from that evidence. Here, plaintiff contends the record contains at the very least enough circumstantial evidence to create a genuine issue of material fact regarding the intent of the defendants to commit the intentional torts alleged by plaintiff. Additionally, plaintiff urges the court to use the definition of intent in the Restatement of Torts (Second) which states that a jury may

presume that an actor intended the consequences of his act, if he was substantially certain those consequences would occur.  Under this definition, plaintiff argues that his intentional tort claims survive summary judgment.

### C.     The United States' Argument

The United States, although not a party, filed a statement of interest on the issue of whether the DBA has an exception for intentional torts, and if so, what the extent of the exception should be.[2] The government argues that the DBA does have an exception for intentional torts, because the DBA covers only accidental injuries.  Intentional torts are not accidents and are therefore not covered by the DBA.  Additionally, the government contends there are good policy reasons why an intentional tort should not be covered by the act.  An employer should not be able to assault an employee with impunity and then confine the employee's recovery to the lesser amounts awarded under workmen's compensation.  Therefore, the deterrent effect of allowing intentional torts to escape the DBA's exclusivity provision is desirable.

However, the government urges the court to construe the exception narrowly for two main reasons.  First, to read intent to encompass more than specific intent to injure would cause accidental injuries and intentional injuries to overlap.  The government defines an accident as an occurrence that is undesigned.  Second, the government argues that to define an intentional tort any more broadly would undermine one of the purposes of the Longshore Act—protecting employers from tort lawsuits. Although the government takes no position regarding the facts of the instant case, it urges the court

---

[2]  The United States filed its statement of interest pursuant to 28 U.S.C. § 517.  The court notes that the issue before it is one regarding the reach of the DBA, a "pure question of statutory construction . . . well within the province of the Judiciary." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 448, 107 S. Ct. 1207 (1987).  Therefore, "[w]hile the United States' views on such an issue are of considerable interest to the [c]ourt, they merit no special deference." *Republic of Austria v. Altmann*, 541 U.S. 677, 701, 124 S. Ct. 2240 (2004).

to define a non-accident, and therefore those torts falling outside the scope of the DBA, as an injury that is designed or intended by the employer.

### 2. The Reach of the Acts

The reach of the DBA's and the Longshore Act's exclusivity provisions vis-a-vis properly alleged intentional torts and fraud claims is a novel issue. The parties present two routes which they argue are mutually exclusive. Either the court must chose the plain language/accident route or the intentional tort exception route to determine the underlying legal question. However, this characterization miscasts the question. Instead of different routes, the parties are arguing different stages of the process. While either step can conclusively answer the ultimate question in this case, these two steps may not be conflated.

### A. Step One - Accident

The first step requires that the plaintiff meet the prerequisites to fall within the scope of the act. To make this determination the court must undertake a strict statutory construction of the DBA and the Longshore Act to define the parameters of the "injury" requirement. "In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Estate of Cowart v. Nicklos Drilling, Co.,* 505 U.S. 469, 475, 112 S. Ct. 2589 (1992) (*citing Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599 (1991)). There is no argument regarding whether the plaintiffs are employees for the purpose of the DBA or whether they were employed pursuant to a contract falling under the act—they are, and they were. The DBA provides that:

> Except as herein modified, the provisions of the Longshore and Harbor Workers'
> Compensation Act, approved March 4, 1927 (44 Stat. 1424), as amended [33 U.S.C.A.
> § 901 et seq.], shall apply in respect to the injury or death of any employee [defined

8

under this act].

42 U.S.C. § 1651(a).  The DBA does not define injury, so the court looks to the definition in the Longshore Act.  The Longshore Act defines injury as an

> accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment.

33 U.S.C. § 902(2).  Accordingly, in order for plaintiffs' claims to fall within the scope of the Longshore Act, and thus the DBA, they must be accidents or the willful acts of third parties as defined by the statute.

      1.    <u>Accident</u>

At the outset, the court notes that the word "accident" in the definition is not itself accidental.[3] Had Congress intended for the Longshore Act to cover any kind of injury occurring as a result of a person's employment, Congress could simply have defined injury as bodily harm.  *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1111 (1st ed. 1924) (defining injury as a "[d]amage or hurt done to or suffered by a person or thing").  However, since Congress chose to modify the type of harm the Longshore Act would cover, the court must determine the scope of the word "accident" in a way that does not render the term meaningless.

"Accident" is not defined by either statute.  Therefore, the court will "construe it in accord with its ordinary or natural meaning."  *Smith v. United States*, 508 U.S. 223, 228, 113 S. Ct. 2050 (1993). Since Congress enacted the Longshore Act in 1927, the court looks to the commonly understood

---

[3] Notably, the New York Workers' Compensation Law of 1922 amended the 1917 version of the statute and removed the word accidental from the section providing coverage for injuries sustained arising out of and in the course of employment.  *See Distefano v. Standard Shipbuilding Corp.*, 196 N.Y.S. 452, 454 (N.Y. App. Div. 1922).  However, the word accidental was not removed from the definition of injury which remained the same in the 1922 version and, therefore, was still a prerequisite for coverage under the statute.  *Id.*

meaning of the word "accident" that the enacting Congress would have had.  *See Perrin v. United States*, 444 U.S 37, 43, 100 S. Ct. 311 (1979).  The Black's Law Dictionary in use at the time defined accident as an "unforeseen event, occurring without the will or design of the person whose mere act causes it." BLACK'S LAW DICTIONARY 15 (2d ed. 1910).  Bouvier's Law Dictionary similarly defined "accident" as an "event which, under the circumstances, is unusual and unexpected . . . the real cause of which cannot be traced, or is at least not apparent."  BOUVIER'S LAW DICTIONARY & CONCISE ENCYCLOPEDIA 101 (3d. rev. 1914).  Webster's Dictionary defined it as

> A befalling; an event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event; chance; contingency; often, an undesigned and unforseen occurrence of an afflictive or unfortunate character; casualty; mishap; as, to die by an accident.

WEBSTER'S NEW INTERNAT'L DICTIONARY 13 (1st ed. 1924).  Parsing these definitions, there are two requisite parts of an "accident."  It must be both undesired and unexpected.

"Undesired" requires no elaboration, but "unexpected" is somewhat more ambiguous.  According to the dictionaries in use at the time of the passage of the Longshore Act, something is "unexpected" if it is  "[n]ot expected; coming without warning; sudden."  *Id.* at 2238.  Webster's defines the term "expected" in more detail.

> To look for (mentally); to look forward to, as to something that is believed to be about to happen or come; to have a previous apprehension of, whether of good or evil; to look for with some confidence . . . . [The synonyms for expect are anticipate and hope which] agree in regarding some future event as about to take place.  Expect is the strongest, and implies some ground or reason in the mind for considering the event as likely to happen . . . .  To anticipate is to look forward to, esp. in such fashion as to realize to one's self what is to come . . . .  Hope adds to expectation the implication of desire.

*Id.* at 770.  Therefore, under the Longshore Act an injury is not an "accident," and thus, not compensable if a reasonable person would have had some grounds or reasons for believeing that the event was likely to occur.  Mere anticipation or uncertain apprehension will not suffice.

10

This understanding of the boundaries of the definition of "accident" finds support in decisional authority from New York at the time of enactment. The Longshore Act was modeled after the New York Workmen's Compensation Act of 1922. H.R. REP. No. 69-1190, at 2 (1926). Therefore, an understanding of how New York courts treated the term "accident" prior to the Longshore Act's passage in 1927 is instructive. In *Woodruff v. R.H. Construction Co.*, New York's highest court examined the case of a carpenter's claim for workers' compensation. *Woodruff v. R.H. Constr. Co.*, 127 N.E. 270 (N.Y. 1920). The carpenter's hand injury at issue came from repetitive use of a screwdriver. *Id.* at 270. The compensation commission granted him benefits. *Id.* However, the court reversed the commission's determination, finding insufficient evidence that the injury was caused by an accident. *Id.* The court explained that

> An accidental event takes place without one's foresight or expectation; an event that proceeds from an unknown cause, or is an unusual effect of the known cause, and therefore not expected.

*Id.* at 270–71 (*citing Paul v. Traveler's Ins. Co.*, 20 N.E. 347 (N.Y. 1889)). The *Woodruff* definition of "accident" was cited by New York courts often in the ensuing years when construing whether a particular injury could be characterized as accidental. *See, e.g., Thompson v. City of Binghamton*, 218 N.Y.S. 355, 357 (N.Y. App. Div. 1926) ("Common speech would describe it as an accident. It was a mishap, unlooked for, unexpected, and happened without design on the part of the deceased."); *D'Oliveri v. Austin, Nichols & Co.*, 207 N.Y.S. 699, 699–702 (N.Y. App. Div. 1925) (collecting cases where injuries held not to be accidental and therefore not covered by workers' compensation); *Guyon v. Standard Wall Paper Co.*, 205 N.Y.S. 280, 281 (N.Y. App. Div. 1924) (finding an injury to be accidental because it was "not the result of volition on [plaintiff's] part; it was not expected; it was not unusual."); *Burke v. Towner Bros.*, 196 N.Y.S. 783, 784 (N.Y. App. Div. 1922) (finding that injuries sustained during an assault were accidental because the assault was a "sudden and unlooked for

11

misfortune"); *Jeffreyes v. Charles H. Sager Co.*, 191 N.Y.S. 354, 355 (N.Y. App. Div. 1921)(finding no coverage for an amputated finger due to repeated chemical exposure because the injury "was expected, and therefore not accidental.").

Furthermore, case law from the time clearly states that the exclusivity of the workers' compensation statute did not extend to all claims regardless of whether they qualified as accidents.

> Applying the definition, therefore, an employer is liable under the law only where 'injury' results from accident, or death results from an injury thus arising. Also the remedy under the law is exclusive only as to 'such injury or death'; I. e., an injury or death involving an accident. If there is no accident, there is no liability, and no remedy under the law. In such case the law is not exclusive, and the common-law remedy, if any there be, may be employed. This plaintiff sustained no accidental injury, since there was no sudden occurrence referable to a definite time or place. We think, therefore, that the plaintiff was not debarred, by the provisions of the Workmen's Compensation Law, from bringing this [negligence] action.

*Wager v. White Star Candy Co.*, 217 N.Y.S. 173, 174–75 (N.Y. App. Div. 1926) (*citing Lerner v. Rump Bros.*, 241 N. Y. 153, 155 (N.Y. 1925); *Jeffreyes*, 191 N. Y. S. at 355). Claims not falling within the purview of the act were viable in the same manner they would have been absent the act. *Trout v. Wickwire Spencer Steel Corp.*, 195 N.Y.S. 528, 528 (N.Y. Spec. Term 1922) ("The statute is exclusive as to cases coming within its scope, but the common-law remedy still exists as to cases not covered by the statute.") (internal citation omitted); *see also Shinnick v. Clover Farms*, 154 N.Y.S. 423, 425 (N.Y. App. Div. 1915) ("As to such an injury [outside the scope of the act], the right to recover remains as it was before the act was passed.") (construing an earlier version of the statute).

Additionally, the court notes that the plain language of the DBA's exclusivity provision is in harmony with the understanding that claims not falling within the scope of the act are not extinguished by the act.

> The liability of an employer, contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this chapter shall be exclusive and *in place of all other liability* of such employer, contractor,

> subcontractor, or subordinate contractor to his employees (and their dependents) *coming within the purview of this chapter*, under the workmen's compensation law of any State, Territory, or other jurisdiction, irrespective of the place where the contract of hire of any such employee may have been made or entered into.

42 U.S.C. § 1651(c) (emphasis added).  The statute clearly contemplates that once a claim falls within the scope of the act, the exclusivity of the act would be complete.  However, by modifying "all other liability" with the phrase "coming within the purview of this chapter," Congress must have intended that any claims not within the purview of the act would still have common law remedies without reference to the act.

Further, the court finds nothing in the legislative history to modify this understanding of injuries falling within the scope of the acts to include more than accidental injuries, because the legislative history of the Longshore Act and the DBA do not reflect any intent on the part of Congress to include any and all damages in the scope of injuries compensable merely by virtue of the employee–employer relationship. The legislative history of the original enactment of the Longshore Act speaks mainly of the benefits to the employees to be covered by the act and less to the benefits enuring to the employer.

> The committee, therefore, recommends that this humanitarian legislation be speedily enacted into law so that this class of workers, practically the only class without the benefit of workmen's compensation, may be afforded this protection, which has come to be almost universally recognized as necessary in the interest of social justice between employer and employee.

H.R. REP. No. 69-1190, at 3 (1926).  Congress plainly intended that the legislation be a compromise between employers and employees.

> Workmen's compensation has come to be universally recognized as a necessity in the interest of social justice between employer and employee.  It is the modern substitute for the old common-law remedy afforded through actions at law for damages, and promptly affords relief to the injured employee . . . without the delay and expense which an action at law entails.

H.R. REP. No. 69-1767, at 20 (1927).  In return for "abolishing liability on the part of the employer

except for the payment of the prescribed compensation," the statute would establish "a compensation

law through which employees are compensated for injuries occurring in the course of their

employment without regard to negligence on the part of the employer or contributory negligence on

the part of the employee."  S.R. REP. No. 69-973, at 16 (1926).  Nothing in the nature of this

compromise relieves the employee, the employer, and the injury from qualifying for the act itself.  In

fact, the Longshore Act contained many different limitations to qualification for its benefits.  As one

commentator pointed out shortly after passage of the act:

> The act as finally adopted follows in the main the theory of the New York
> Compensation Act, but there are several problems peculiar to it which merit some
> special discussion.  Next to its constitutionality the most important question is that of
> its scope.  Section 2(4) has been so construed by the United States Employees
> Compensation Commission as to limit benefits to workers engaged in maritime
> employment on navigable waters.  Section 3, entitled "coverage," further limits its
> application by providing that compensation shall be payable "only if death or disability
> results from an injury occurring upon the navigable waters of the United States
> (including any dry dock) and if recovery . . . through workmen's compensation
> proceedings may not validly be provided by state law."  It also excludes from the
> operation of the act disability or death of (1) a master or member of a crew of any
> vessel and any person engaged by the master to load or unload or repair any small
> vessel under eighteen tons net; (2) an officer or employee of the United States or any
> agency thereof or of any state or foreign government, or of any political subdivision
> thereof.  Subdivision (b) of the same section provides that "no compensation shall be
> payable if the injury was occasioned solely by the intoxication of the employee or by
> the wilful intention of the employee to injure or kill himself or another."

George W. Stumberg, *Harbor Workers and Workmen's Compensation,* 7 TEX. L. REV., 197, 198–99

(1929).  In order to fall within the act, many criteria must be met.  Nobody would argue that a person

not qualifying as an "employee" under the act would lose all of his or her common law remedies

against an employer.  Likewise, a contract not qualifying under any section of the DBA would not give

rise to compensation rights by an employee against an employer.  Thus, it follows that damage not

meeting the criteria for coverage by the act does not fall under the scope of the act and does not merit

compensation.  By the same token, any common law remedies available for that damage are not abolished by the act's exclusivity provision.

And, a review of the legislative history of both acts offers no support for the concept that the exclusivity of the act could reach beyond the act's scope to extinguish common law remedies for damages outside the act.  The legislative history of the 1984 amendments to the Longshore Act specifically references the exclusivity of the act while in the same breath recognizing that first a determination must be made regarding whether a person falls within the scope of the act.

> In the committee's view, the Longshore Act should be the primary source of compensation for covered workers who are disabled or who may die as a result of a job-related injury or disease.  The reference in section 5(a) (as herein amended) to "other workers' compensation law(s) or section 20 of the act of March 4, 1915" is not intended to suggest that any workers who might be able to present claims or bring actions under such laws are excluded from coverage as "employees" under the Longshore Act.  In the committee's view, such reference should have no bearing on the determination of whether an employee is within the coverage of the Longshore Act. Longshore Act coverage is to be determined solely on the basis of the provisions of the Longshore Act, and without reference to the availability which any such "employees" may have to remedies outside that law.

H.R. REP. No. 98-570(I), at 7 (1984).  As the report notes, once it is determined that a person falls within the scope of the act, the compensation scheme replaces all other liability.  *Id.*  However, "Longshore Act coverage is to be determined solely on the basis on the provisions of the Longshore Act." *Id.*

The legislative history for the DBA also discusses Congress's reasons for enacting the legislation—concern regarding insurance rates and uncertain foreign laws.

> The War Department has advised that particularly because of the excessive cost of employers' liability insurance, the necessity for and desirability of so extending the legislation [to cover other possessions of the United States] has become increasingly apparent.  Also, that lack of uniformity and absence of adequate protection under local laws create an undesirable situation, both as to employer and employee.

H.R. REP. No. 77-1070, at 4–5 (1941).  The Secretary of War in a letter to the Judiciary Committee

explained that "[e]nactment of legislation establishing and defining rights and remedies, it is believed, will enable insurance carriers better to evaluate their risks and to reduce their premium rates accordingly." *Id.* at 4.  The Secretary went on to note that if insurers could better predict premiums, then contractors could pass those costs through to the United States as part of the bid for the contract. *Id.* This stability would, in turn, benefit the government by ensuring the timely completion of defense projects.  *Id.*  None of the articulated reasons in the legislative histories for the acts or their amendments supports extending the scope of the act past the plain language of the statute.

The only legislative history discussing the scope of injuries covered under the act is for the War Hazards Compensation Act ("WHCA"), 42 U.S.C. § 1701 *et seq.*, enacted in 1942 as a supplement to the DBA, which sheds some faint light on the coverage of the DBA.  *Id.*  In a letter to the Chairman of the House Judiciary Committee, the Chairman of the United States Employees' Compensation Commission made the following remarks with regard to the coverage of the DBA:

> [T]he bill contemplates that employees employed by Government contractors at such outlying places . . . shall be given 24-hour protection under a workmen's compensation law against the hazards of war.  This protection they do not have at the present time, *as the limit of coverage at present . . . is solely against industrial accidents*, which is only one of the hazards to which such employees are subjected.

•            •            •

> [I]t is the design of this bill to filter off all liability in injury and death cases arising under the [DBA], where the cause of injury or death is solely a hazard of the war. Employers and their insurance carriers will continue their assumption of liability for *injury and death due to normal industrial hazards* under the [DBA] . . . .

H.R. Rep. No. 77-2581, at 5 (Letter from the U.S. Compensation Committee Chairman to the House Judiciary Committee) (emphasis added).  Later in the report, the committee remarked that it considered that war hazards occurring while on the job would, in fact, be covered by the DBA.  *Id.* at 12. Although by themselves these passing references shed little light on the question of the scope of an

16

"injury" under the act, they do suggest—albeit obliquely—that Congress was aware that the Longshore Act and the DBA covered only accidental injuries, rather than all injuries.

Defendants argue that holding the scope of the act to accidental injuries only will invite a flood of litigation, contrary to one of the purposes of the acts.  However, the Department of Labor (the Benefits Review Board) and various courts have been making this determination for years.  For example, the New York cases from the 1920's—discussed above—all review whether a given injury was an accident.  And, these determinations still continue today.  *See, e.g., Amerada Hess Corp. et al. v. Dir., Office of Worker's Comp. Programs*, 543 F.3d 755, 760–61 (5th Cir. 2008); *Franks Casing Crew & Rental Tools, Inc. v. Dupre*, 248 Fed. Appx. 581, 585 (5th Cir. 2007) (*citing Wheatley v. Adler*, 407 F.2d 307, 311 n. 6 (D.C.Cir.1968); *Miss. Shipping Co. v. Henderson*, 231 F.2d 457, 460 n. 2 (5th Cir.1956)); *Pacific Employers' Ins. v. Pillsbury*, 61 F.2d 101, 103 (9th Cir. 1932) ("The approved definition of accidental injury or injury by accident is [a]n unlooked for mishap or untoward event which was not expected or designed; and as something out of the usual course of events, and which happens suddenly and unexpectedly, and without any design on the part of the person injured.") (internal quotations omitted); *Southern Shipping Co. v. Lawson*, 5 F. Supp. 321, 324 (S. D. Fla. 1933) ("In compensation cases, the accepted definition of accidental injury is an unlooked for mishap or untoward event which was not expected or designed.") (internal quotations omitted).  The determination of whether an injury falls within the act is in reality a fairly common and straightforward inquiry.

On a related note, the United States posits that courts will be unable easily to determine which injuries are accidents and which are not.  The definition, they urge, is difficult for courts to apply consistently.  The court disagrees.  Workers' compensation is a form of insurance.  And, courts construe whether events are accidents for the purpose of insurance disputes with regularity.  This form

17

of insurance does not differ from any other in that respect.   Additionally, the United States argues that if the definition of accident is too narrow, some negligence claims might fall outside the scope of the act.   However, the court finds that, as discussed more fully below, the questions of whether an injury is an "accident" and whether the claim that might arise from it is a negligence claim are separate and distinct.   There may be cases where the effect of an employer's negligent actions, while undesired, are expected—not merely anticipated or feared as uncertain.   "If anomalies actually do occur with any frequency in the day-to-day administration of the Act, they provide a persuasive justification for a legislative review of the statutory" definitions.   *Potomac Elec. Power Co. v. Dir., Office of Workers' Comp. Programs*, 449 U.S. 268, 284, 101 S. Ct. 509 (1980).   Given that courts and the BRB have been making determinations regarding whether injuries are accidental under the act since its inception, the avalanche of hypothetical cases against which the United States counsels seems doubtful to occur. Either way, it is a policy decision beyond the reach of the judiciary.

Moreover, binding precedent from the United States Supreme Court supports the court's method for determining the scope of the word "injury" in this case.   In *Potomac Elec. Power Co. v. Director, Office of Workers' Compensation Programs*, the Supreme Court examined the recent trend of the Benefits Review Board ("BRB") and state courts which allowed injured workers to opt between either scheduled benefits of a set amount for an injury identified in the statute or a larger recovery based on lost wage-earning capacity.   449 U.S. at 270–71.   The Court started with the plain language of the statute itself and found that the language specifically prescribed the method of compensation for the different categories of injuries.   *Id.* at 273–74.   Additionally, the Court declined to read the phrase "all other cases" to include "all of the forgoing cases," because nothing in the statute supported a different interpretation other than the plain meaning of the words.   *Id.* at 274.

The Court next moved to the legislative history of the Longshore Act, which adopted the New

18

York Workers' Compensation Law of 1922.  The Court found no specific guidance in the legislative history with respect to the exclusivity of the scheduled benefits, but concluded that "[n]othing in the original legislative history of the Federal Act or in the legislative history of subsequent amendments indicates that Congress did not intend the plain language of the federal statute to receive the same construction as the substantially identical language of its New York ancestor." *Id.* at 276.  The Court then looked to a contemporaneous case in New York's highest state court construing the schedule of benefits at issue.  *Id.* at 275.  The New York court found that on its face the schedule language clearly did not contemplate that the phrase "all other cases" would include injuries specifically identified in the New York statute.  *Id.* (*quoting Soklowski v. Bank of America*, 184 N.E. 492, 494 (N.Y. 1933)).  Therefore, the Supreme Court likewise declined to read the phrase to mean more than was evident on its face.

In response to the argument that the Court should follow the state law trend away from the exclusivity of scheduled benefits, because of the remedial nature of the statute, the Court unequivocally reiterated the role of the courts in construing the Longshore Act.

> Our task is to ascertain the congressional intent underlying the schedule benefit provisions enacted in 1927; we are not free to incorporate into those provisions subsequent state-law developments that we may consider sound as a matter of policy. In attempting to ascertain the legislative intent underlying a statute enacted over 50 years ago, the view that once "dominate[d] the field" is more enlightening than a recent state-law trend that has not motivated subsequent Congresses to amend the federal statute.  The once dominant view is entirely consistent with a literal reading of the Act.

*Id.* at 280.  The Court recognized that the exclusivity of the scheduled benefits could sometimes produce harsh and incongruous results.  However, it reiterated that when "'compelling language' produces incongruities, the federal courts may not avoid them by rewriting or ignoring that language."

*Id.* at 283.  And, the Court concluded that "[s]uch compelling language is present in this case."[4]  *Id.* at 284.  Additionally, the Court remarked that Congress had not chosen to amend the statute even in the face of the state law trend away from the exclusivity of schedule benefits.  Therefore, the Court suggested that the state law trend was not the strongest indicator of what Congress intended for the act.

Here, the question before the court bears a strong resemblance to the question in *Potomac*. Therefore, the court must confine itself to the inquiry outlined by the Supreme Court in *Potomac*. District courts must follow the rule of law.  A court's job is not to make policy decisions; they are left to Congress.  In spite of the fact that state courts have interpreted their own workers' compensation laws to have various exceptions of different scope, neither the DBA nor the Longshore Act contains an intentional tort exception, and Congress has not amended either act to address this question. Therefore, in light of the plain language that Congress specifically chose based on the understanding of the term accident from common usage and as defined by case law—both historical and modern, the court finds that in order to fall within the scope of the DBA, an injury must be an accident—an undesired *and* unexpected event.

### 2. Willful Acts of Third Parties

Alternatively, the definition of injury includes "the willful act of a third person directed against an employee because of his employment."  33 U.S.C. § 902(2).  At the outset, the court notes that the phrase "because of his employment" is different from the language in the first part of the definition of injury requiring that the accidental injury or death arise "out of and in the course of employment." *Id.*  Since Congress used these two different phrases within the same section, the court must assume that Congress intended the phrases be treated differently.

---

[4] The court notes that in the instant case, the plain and compelling language of the statue would *not* produce the incongruous result that the Supreme Court warned against in *Baltimore & Philadelphia Steamboat Co. v. Norton*. 284 U.S. 408, 412–13 (1932).

Therefore, the court must look to the plain meaning of the words used by Congress to determine the scope of the phrase.  In 1927, Webster's Dictionary defined the word "because" as "by or for the cause that; on this account that; for the reason that."  WEBSTER'S REVISED UNABRIDGED DICTIONARY 130 (1st ed. 1913).  Unlike "in the course of," the definition of the word "because" includes causation, and in fact contains "cause" as part of its root.  The employee's employment must have caused the third person's willful act.  The Webster's Dictionary is less helpful regarding the word "employment."

> 1. The act of employing or using; also, the state of being employed.
>
> 2. That which engages or occupies; that which consumes time or attention; office or post of business; service; as, agricultural employments; mechanical employments; public employments; in the employment of government.

*Id.* at 486.  In fact the synonyms that Webster's gives for the word are more helpful—"[w]ork; business; occupation; vocation; calling; office; service; commission; trade; profession."  *Id.*  Fairly read then, the phrase means that an injury includes the willful act of a third person caused by the employee's particular trade or occupation.

The phrase "out of and in the course of employment" has been examined by many courts over the years.  *See, e.g., Thompson v. City of Binghamton*, 218 N.Y.S. 355, 357 (N.Y. App. Div. 1926) (finding that an employee was injured in the line of duty and therefore within the scope of his employment); *Plouffe v. American Hard Rubber Co.*, 207 N.Y.S. 373, 375 (N.Y. App. Div. 1925) (finding that a worker stepped out the scope of his employment when he engaged in a personal fight with a co-worker); *see also O'Keeffe v. Smith, Hinchman & Grylis Assocs.*, 380 U.S. 359, 362–63 (1965) (examining the BRB's determination that the injury arose out of the scope or course of employment).  The Fifth Circuit has recently discussed the reach of the course or scope of employment for the DBA.  In *Jones v. Halliburton*, the Fifth Circuit reiterated that the course or scope of

employment aspect of the statute was intended to be very broad and that "'[t]he test of recovery is not a causal relationship between the nature of employment of the injured person and the accident . . . . All that is required is that the obligations or conditions of employment create the zone of special danger out of which the injury arose.'"   583 F.3d 228, 238 (5th Cir. 2009) (*quoting   O'Leary v. Brown-Pacific-Maxon,* 340 U.S. 504, 506–07, 71 S.Ct. 470 (1951)).   It is not in dispute here that the plaintiffs were acting within the course and scope of their employment.   Moreover, if Congress had meant the broader concept of "arising from or in the course of his employment," it would have used those very words like it did a few sentences earlier in the same section.   And, this determination is different from the question of whether they were injured *because* of their employment.

Instead, for determining the willful act of a third party, the court determines an injury using the much narrower phrase, "because of his employment."   Unlike "out of and in the course of employment," the phrase "because of his employment" has received very little attention.   Cases in New York during the 1920's focus almost entirely on the inquiry of whether the injury was an accident arising out of and in the course of employment.   The court finds that it cannot ignore the fact that Congress chose two different phrases within the same section and expand "because of his employment" to mean because he was an employee of the employer.   Therefore, the common meaning of the phrase "because of his employment" which requires the assault be caused by the person's occupation is the meaning the court will use in this case.

Defendants cite a case from the District of Columbia Appellate Court that addressed the "willful act of a third party against the employee because of his employment" prong of the statute. *Grillo v. Nat'l Bank of Wash.*, 540 A.2d 743, 751–53 (D.C. 1988).   The *Grillo* court conflated the two inquiries of whether the injury qualified for the act and whether the injury fell into an intentional tort exception and found that the plaintiff had not adduced any evidence that her employer had conspired

with the third person—here a bank robber—to intentionally injure her.  *Id.* at 751.  Defendants argue

that because the District of Columbia uses the Longshore Act as its workers' compensation scheme,

great weight should be given to its courts in interpreting the act.  Additionally, they urge the court to

accept the proposition that in order for the injuries caused by the willful act of a third person to be

exempted from coverage under the act, the employer must have conspired with the third person to

bring about the injury.

The court finds this position untenable for two main reasons.  First, there is no textual basis

for the inclusion of the collusion on the part of the employer.  The *Grillo* court likely read this

requirement into the statute because it considered the definition in the context of a possible intentional

tort exception.  The court chooses to keep those two inquiries separate since they apply to two different

aspects of the statute.  Second, the defendants' broad reading of "because of his employment" would

make essentially every willful act by a third person an "injury" under the act.  If that is the case, then

the phrase "because of his employment" is merely redundant.  Congress chose its requirements for an

injury—(1) willful act of a third party against an employee, and (2) because of his employment.  The

court declines to modify the statute by either adding or subtracting requirements to the definition of

injury.

Accordingly, the court finds that in order to be an injury covered by the DBA, the harm must

result from one of the following: (1) an accidental injury or death—both undesired and

unforeseen—arising out of and in the course of employment, or (2) an injury caused by the willful act

of a third person directed against an employee caused by the employee's trade or occupation.[5]  Under

the plain language route, injuries not falling within one of the categories are not covered by the DBA

---

[5]  No one argues that the plaintiffs could qualify under the second type of injury—an occupational disease or infection either (a) arising naturally out of the employee's occupation, or (b) as naturally or unavoidably results from an accidental injury, as described above.  *See* 33 U.S.C. § 902(2).

23

and may be pursued in court through whatever common law torts are available.

B.     *Step Two - Exclusivity*

Once a court determines that a plaintiff's claims fall within the scope of the act, the court must then examine whether the DBA's exclusivity provision would bar a plaintiff's claims. Workers' compensation is well recognized as a compromise between employers and employees. *See Potomac Elec. Power Co. v. Director, Office of Workers' Compensation Programs*, 449 U.S. 268, 281 (1980). The main benefit for employees includes prompt insurance coverage for on the job injuries without the necessity of proving liability which can be costly and slow. *Id.* They give up the right to sue for any injuries falling within the purview of the act in return for a certain—if not complete—recovery. *Id.* The main benefits for employers are predictable insurance premiums and freedom from constant and costly litigation. *Id.* Employers give up their common law defenses such as assumption of the risk and comparative negligence. *Id.* In return they receive definite and lower limits on damages for work-related injuries. *Id.*

Despite strongly worded exclusivity provisions, some states have recognized an exception to the exclusivity of their various workers' compensation statutes for intentional torts committed by the employer against the employee. 6 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW § 103.01 (2009). According to Professor Larson there are three main theories upon which this exception has been based. *Id.* The first, and in his opinion the best, basis is that the injury is not alleged to be "accidental" and therefore not a compensable injury under the statute. *Id.* The second theory posits that the act of violence by the employer severs the employment relationship. *Id.* The third is that the assault would not, by its very nature, be work-related. *Id.* Larson also points out that courts have made "resounding moralistic pronouncements . . . in the process of justifying an exception to the normal exclusiveness rule." *Id.* But, state court developments since the time of the Longshore

24

Act's enactment are not a proper guide to construing the federal statute. *Potomac*, 449 U.S. at 279–80.

 As with its examination of the definition of "injury," the court starts with the plain language of the statute. The DBA's exclusivity provision reads in relevant part

> The liability of an employer . . . under this chapter shall be exclusive and in place of all other liability of such employer . . . to his employees (and their dependents) coming within the purview of this chapter, under the workmen's compensation law of any State, Territory, or other jurisdiction, irrespective of the place where the contract of hire of any such employee may have been made or entered into.

42 U.S.C. § 1651(c). The language of this section is emphatic and unambiguous. In this case, the court need not resort to any dictionaries to divine the plain meaning of the section.

 And, the legislative history of the acts and their amendments reiterates the importance of this exclusivity. H.R. REP. No. 69-1767, at 19 (1927) (recognizing that workers' compensation was "the modern substitute for the old common-law remedy afforded through actions at law for damages"); S.R. REP. No. 69-973, at 16 (1926) (describing the exclusivity provision as "abolishing liability on the part of the employer except for payment of the prescribed compensation"). Moreover, like in *Potomac* the court finds no indication that Congress wished to depart from New York courts' interpretation of the 1922 New York workers' compensation law upon which the Longshore Act was based. And, the New York courts in the 1920's interpreted that statute as exclusive for those injuries coming within its scope. *See, e.g., Trout v. Wickwire Spencer Steel Corp.*, 195 N.Y.S. 528, 528 (N.Y. Spec. Term 1922) ("The statute is exclusive as to cases coming within its scope, but the common-law remedy still exists as to cases not covered by the statute.") (internal citation omitted); *see also Shinnick v. Clover Farms*, 154 N.Y.S. 423, 425 (N.Y. App. Div. 1915) ("As to such an injury [outside the scope of the act], the right to recover remains as it was before the act was passed.") (construing an earlier version of the statute).

 Moreover, those cases where the Fifth Circuit has discussed the scope of the exclusivity

provision of the Longshore Act, the court has indicated that the exclusivity is absolute.  For example, in *Nations v. Morris*, Judge John R. Brown stated emphatically that the exclusivity provision of the Longshore Act

> completely obliterates the rights at common, civil or maritime law against Employer and fellow employee.  Congress in its unlimited power has determined that the relationship gives rise only to compensation liabilities.  The nature of the obligation is that there is no—the word is *no*—obligation.

483 F.2d 577, 587–88 (5th Cir. 1973).  In *Atkinson v. Gates, McDonald & Co.* the plaintiff's claims were predicated on the fact that her compensation payments—to which she was entitled—had been withheld, causing her emotional anguish.  838 F.2d 808, 809 (5th Cir. 1988) (en banc).  The court held that the Longshore Act was "the exclusive remedy for the nonpayment of compensation benefits due thereunder."  *Id.* at 810.  Most recently, in *Johnson v. ODECO Oil & Gas Co.*, the Fifth Circuit expressly refrained from examining the scope of the Longshore Act.  864 F.2d 40, 44 (5th Cir. 1989) (emphasis added).  Instead, it held that "[e]ven if [the Longshore Act] is not so exclusive as to preclude a lawsuit by an employee for an intentional tort committed by his employer, this is not such a lawsuit."  *Id.*  Although the court assumed for the sake of argument that an intentional tort might be excluded and agreed with the district court that the claim presented was a negligence claim, it expressly declined to examine the scope of the act.[6]  *Id.*  And, the court's phrasing suggests that were it to examine the

---

[6]  The court notes that the facts of *ODECO* would fall squarely within the definition of accident as described above.  In *ODECO*, the plaintiff—Johnson—was employed on an oil production platform located in the Gulf of Mexico.  *Johnson v. ODECO Oil & Gas Co.*, 864 F.2d 40, 41 (5th Cir. 1989).  The injuries at issue occurred when on the same day that Tropical Storm Juan was upgraded to a hurricane, it struck the oil platform.  *Id.*  The living quarters on the platform were destroyed allowing poisonous gasses to escape.  *Id.*  Johnson sustained injuries to his eyes and lungs from the gasses.  *Id.*

Certainly ODECO did not desire that Hurricane Juan destroy part of its oil production platform if for no other reason than the enormous costs of both repairing the damage and the temporary halt of production.  Therefore, the injury was undesired.  And, the facts illustrate that while ODECO believed that Tropical Storm Juan might hit the platform, it could have no warning that the storm would suddenly strengthen and turn into a hurricane—a far stronger storm.  The facts plainly show that the storm upgraded so quickly that the weather service did not even have time to issue hurricane warnings.  Thus, the hurricane was also unexpected.  Therefore, Johnson's injuries were the result of an accident, because they were both undesired and unexpected.

scope of the provision it would find that the exclusivity contains no exception.

Furthermore, if the statute is applied according to its plain terms, courts need not resort to "moralistic resoundings" or acrobatic explanations regarding why, contrary to the unambiguous language of the statute, exclusive does not mean exclusive. If courts require that claims meet all of the prerequisites expressly listed in the statute in order for those claims to fall within the scope of the act, then intentional torts by employers against employees would almost never fall within the definition of an "injury" compensable under the act because they are not accidental. Claims not falling within the act could still be pursued via whatever common-law or other means are available. Claims falling within the scope of the act would have the act as their exclusive remedy. And, despite the defendants' and the United States' forecasts of surges in litigation, slippery slopes in defining an accident, and slowdowns in defense contracting, the administration of claims under the Longshore Act and the DBA would not change in any real respect. Claims must qualify for compensation—as they have been required to do over the eighty years since the passage of the Longshore Act—regardless of whether the act is being used as a shield or a sword. Once a claim qualifies for compensation, the act "completely obliterates the rights at common, civil or maritime law against Employer and fellow employee." *Nations*, 483 F.2d at 587. Accordingly, the court holds that there is no exception to the exclusivity provision of the DBA for those injuries falling within the purview of the act.

### 3. Application

Having determined the proper inquiry, the court now turns to its application to the facts in this case. For the limited purpose of this order only, the protective order is lifted as to the excerpts used by the court.

### A. Step One - Injury

As explained above, the determination of whether the plaintiffs' claims qualify as injuries

under the DBA turns on the nature of the injury alleged, not the characterization of any common-law claims plaintiffs might bring based on those damages. Therefore, in order for plaintiffs' damages to be injuries within the meaning of the act, they must either be accidents or the willful acts of third parties because of the plaintiffs' employment.

1.   <u>Accident</u>

As discussed above, to be an accident the event must be both undesired and unexpected. As a threshold matter, the court finds nothing in the record to support the proposition that the defendants desired that any of the drivers be injured or killed in an attack by Iraqi insurgents. They certainly desired to send the convoys, but that is different from desiring the damage or hurt caused by the event. Accordingly, the claims meet the first prong to be considered accidental and therefore a compensable "injury" under the DBA.

The court now moves to the second prong of the "accident" inquiry—unexpected. At the outset, the court reiterates that for the event to be expected, the defendants must have had grounds or reasons to believe that the event was likely to occur. Mere anticipation of or uncertain apprehension regarding the event will not suffice. Therefore, a generalized apprehension or anticipation that driving fuels convoys was dangerous because Iraq was a war zone actively engaged in guerilla-style warfare will not make a specific event expected. In order for the plaintiffs to demonstrate that their damages were not accidental under the DBA, they must show that the actual event giving rise to their claims was specifically expected. Since each case centers around a different event, the court looks at each separately.

<u>*Smith-Idol*</u>

Kevin Smith-Idol, as a driver of the Hacklen convoy, was dispatched in the morning hours of April 8, 2004 to drive from Camp Anaconda via Taji to Ridgway. Dkt. 339, Ex. 38. The Hacklen

28

convoy was ambushed at 12:33 p.m.  Dkt. 342, Ex. 197.  The evidence in the record demonstrates that although the defendants may have feared increasing hostile activities might occur in the week leading up to April 9, 2004, they did not expect that the Hacklen convoy would be attacked on April 8, 2004.  In fact, the evidence adduced by Smith-Idol in his response to the defendants' motion for summary judgment on this issue confirms that the defendants were scrambling to react to attacks they feared, but did not expect.

Several convoys were hit on April 8, 2004.  But, the email traffic indicates that the attacks began to escalate around the time the Smith-Idol's convoy was hit—long after his convoy had left its base.  *See* Dkt. 340, Exs. 65, 66, 67.  Defendants' management was clearly attempting to adjust to this change of affairs.  *Id.* at 68.  At 1:51 p.m. Iraq time on the 8th, Keith Richard—another of defendants' managers in charge of the fuel convoys—wrote "Another Convoy under attack. . . . [W]e need some type of Intel advice on our convoy pushes.  Just received another message from a convoy that they are under Mortor attack and 2 drivers are hit.  I need to confirm the details."  *Smith-Idol* Dkt. 107, Ex. 6.  At 2:04 p.m. Iraq time, the Deputy Project Manager—Ray Rodon—suggested that it was time to increase military protection for the convoys.  Dkt. 340, Exs. 65, 66, 67.  In an email at 2:23 p.m. Iraq time on the 8th, Craig Peterson—the defendants' manager in charge of the convoys—wrote "according to our qualcom comms[7] we currently have 4 convoys under attack.  Are [we] doing something wrong or linking with the incorrect ops center???"  *Smith-Idol* Dkt. 107, Ex. 5.

Clearly defendants knew that it was dangerous to travel the roads in Iraq in the week leading up to April 9, 2004.  But at best, the record demonstrates that the defendants may have had a heightened apprehension that convoys (and any other American traffic) might be attacked in that time-period.  And, that is not enough to characterize the event that caused his damages as expected.

---

[7] Units allowing written communication between the convoys and the base.

Therefore, the court finds that plaintiff Smith-Idol's damages occurred as the result of an accidental injury as defined by the Longshore Act.

The DBA's exclusivity reaches all of Smith-Idol's claims including his claim for fraudulent inducement. To succeed on a claim for fraudulent inducement under Texas law Smith-Idol must prove that (1) defendants made a material representation that was false; (2) they knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) they intended to induce Smith-Idol to act upon the representation; and (4) Smith-Idol actually and justifiably relied upon the representation *and thereby suffered injury*. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). "Evidence of injury or damage to the plaintiff is an essential element of fraud." *Nelson v. Regions Mortg., Inc.*, 170 S.W.3d 858, 862 (Tex. App.–Dallas 2005, no pet.). Here, the injury is the bodily harm that Smith-Idol received when his convoy was attacked on April 8, 2004. And, the DBA "completely obliterates the rights at common, civil or maritime law against Employer and fellow employee." *Nations*, 483 F.2d at 587. It could be argued that the alleged fraud would vitiate the employment contract. 26 WILLISTON ON CONTRACTS § 69:4 (4th ed. 2009). However, the DBA's scope is a function of the statute itself, not the contract. And, Smith-Idol's status as an employee for the purposes of the act is determined by the relationship between the parties, not their contractual status. *See Haynie v. Tideland Welding Serv.*, 631 F.2d 1242, 1243 (5th Cir. 1980). Thus, Smith-Idol's claims for fraudulent inducement premised on the injuries he sustained during the attack on April 8, 2004 are extinguished by the act. Accordingly, the DBA is his sole recourse for those injuries and defendants' motion for summary judgment is GRANTED as to all of Smith-Idol's remaining claims—including his claim for fraudulent inducement.

### Fisher

The drivers in the *Fisher* case were a part of the Hamill convoy. Their convoy left Camp

Anaconda at 10:40 a.m. on April 9, 2004 via MSR (Main Supply Route) Sword and MSR Tampa traveling to Baghdad International Airport. For several reasons, the court finds that there is a genuine issue of material fact regarding whether the defendants had actual knowledge that the Hamill convoy would be attacked and that the event was therefore expected.

First, on April 2nd at least a week before the attack, one of the defendants' security managers sent out a security update indicating that due to a confluence of events April 9th would be especially dangerous for any Americans in Iraq. Dkt. 341, Ex. 179. April 9th was the first day of a Shia Muslim holiday, Arabeen, and the one year anniversary of the United States' presence in Baghdad. *Id.* It was also Good Friday. On April 4th, another security manager, sent an email reiterating that there were reports that Shia groups were planning a coordinated attack to include assaults and kidnappings, most likely tied to the Muslim holiday of Arabeen. Dkt. 339, Ex. 26. On April 7th, yet another security manager for defendants again warned in an email that April 9th and 10th would be especially deadly. Dkt. 340, Ex. 56.

By themselves, these emails would not be enough to characterize the event as expected. However, they set the stage for the events of the 8th and 9th. As discussed above, on April 8th, the defendants' convoys began taking heavy fire with disastrous results. In the ensuing rush to try to determine the correct course of action, Ray Rodon—the Iraq Project Manager—sent an email to Craig Peterson and Keith Richard at 2:05 p.m. on April 8th suggesting that the Army double the number of shooting platforms from 2 per 25 vehicles to 4 per 25 vehicles. Dkt. 340, Ex. 98. He also predicted that "[w]ith the intensity of the conflicts and number of incidents; it is only a matter of time before we take serious casualties." *Id.* At 2:10 p.m., Peterson responded saying that security had been increased but, "[e]ven with 10+ escorts they cannot defend our convoys." *Id.* As April 8th wore on, the gravity of the situation became clearer. The 2:00 p.m. convoy movement report showed 2 convoys under

heavy mortar fire, 2 more under small arms attack, and 4 more delayed or turned back due to hostile action.  Dkt. 339, Ex. 38.  The security emails intensified.  Some emails suggested halting all convoys on the 9th because "there is tons of intel stating that tomorrow will be another bad day."  Dkt. 341, Ex. 155.

At 10:28 p.m., Keith Richard agreed that drivers should not be sent on routes classified as red or highly dangerous, saying "Another day like today and we will lose most of our drivers."  *Id.*  One hour later, with no explanation, he changed his position.  "I have to retract this message.  If the military pushes, we push."  *Id.*  Twenty minutes after his retraction, Richard resigned.[8]

> I cannot continue my employment with KBR.  Therefore, I am resigning my employment with KBR effective Saturday, 10 April.  I have conveyed my concerns, professional opinions and advice.  Yet, we are still going to send our drivers out on the [Main Supply Routes] without adequate route security and support.  I cannot consciously sit back and allow unarmed civilians to get picked apart.

Dkt. 341, Ex. 161.  By 11:01 p.m., the defendants knew that some convoy drivers would be attacked and killed, most likely at the junction of MSR Tampa and MSR Sword the next day.  Dkt. 341, Ex. 142.  ("Expect numerous IED's along each MSR with a high concentration at the MSR Tampa and Sword junction. . . . IED quickly followed by [small arms fire] and Mortor attacks on stopped vehicles . . .").  The question was who, when, and where.

By the next morning, arguably they had that answer.  The following communications are a sampling of those that occurred on the morning and early afternoon of April 9, 2004.  The times have been standardized to the local time in Iraq on the day in question.

6:40 a.m.        Keith Richard emailed to alert people that the following routes were red: MSR's Sword, Lincoln, and Tampa (between Taji and Baghdad).  Dkt. 338, Ex. 11.

7:08 a.m.        Craig Peterson cancelled all convoys on military "red" routes for the day.  Dkt. 339, Ex. 43.

---

[8] He subsequently withdrew his resignation.

| | |
|---|---|
| 7:08 a.m. | Keith Richard updated the status of MSR Sword as amber and advised that he would begin pushing convoys north and south along MSR Sword.  Dkt. 339, Ex. 43. |
| 7:40 a.m. | George Seagle—Director of Security—predicated with chilling accuracy that "today should be the worst yet in the Baghdad area," and added "Hope I'm wrong!"  Dkt. 339, Ex. 43. |
| 8:18 a.m. | Keith Richard emails that the routes are red.  Dkt. 339, Ex. 43. |
| 9:05 a.m. | Qualcomm "Per Keith Richard, Project Manager, all traffic is to proceed as normal. All MSR traffic lanes are open in all directions. TTM Operations."  Dkt. 346, Ex. 258. |
| 9:31 a.m. | Hourly convoy update shows no hostile activities.  Dkt. 340, Ex. 71.  Hamill convoy is staging at Anaconda.  *Id.*  The Longstreet convoy is in route north to Anaconda.  *Id.* |
| 9:57 a.m. | Hourly convoy update for 10:00 a.m. shows that the Reedel convoy is experiencing "hostile action" at the intersection of MSR Sword and MSR Tampa. Dkt. 339, Ex. 44. The Hamill convoy is staging at Anaconda.  *Id.*  The Longstreet convoy is in route north to Anaconda.  *Id.* |
| 10:40 a.m. | Qualcomm Text from Hamill's truck.  Hamill convoy departs Anaconda in route to Baghdad International Airport.  Dkt. 341, Ex. 160. |
| 10:41 a.m. | Richard receives email with the 10:30 a.m. convoy status report.  Three more convoys—Teddy, Tomaszewski, and Watson—reported under fire near one of the gates to the Baghdad International Airport. Dkt. 340, Ex. 104.  Reedel convoy still reported as under fire at the intersection of MSR Sword and MSR Tampa.  *Id.*  Larvenz convoy diverted from MSR Sword due to hostile action.  *Id.* |
| 10:41 a.m. | Richard receives email that MSR Tampa is red.  Dkt. 340, Ex. 104. |
| 10:56 a.m. | Keith Richard emails Houston office and says that "due to the recent events, we need to expedite the hiring of drivers."  Dkt. 339, Ex. 46. |
| 11:01 a.m. | Email from Ray Simpson, one of defendants' security managers. "Can anyone explain to me why we put civilians in the middle of known ambush sites?  All three of these convoys are presently under [small arms fire] in the same general area and yet MSR Tampa and Sword remain green.  Maybe we should put body bags on the packing list for our drivers."  Dkt. 340, Ex. 128. |
| 12:11 p.m. | Emergency Panic Button pushed in Hamill's truck.  Dkt. 341, Ex. 160. |
| 12:13 p.m. | Emergency Panic Button pushed again in Hamill's truck.  *Id.* |
| 12:17 p.m. | Qualcomm from base reading "Hamill, give details."  *Id.* |

12:18 p.m.     Emergency Panic Button pushed a third time in Hamill's truck.  *Id.*

12:20 p.m.     Emergency Panic Button pushed a fourth time in Hamill's truck.  It was his last transmission.  *Id.*

      As discussed above, an event is expected if the defendants had grounds or reasons to believe that the event was likely to occur.  In light of the warnings specifically about the 9th of April, the attacks all in the same area—MSR Tampa (between Taji and Baghdad), and the intersection of MSR Tampa and MSR Sword—and the fact that at the very moment the defendants sent out the Hamill convoy there were four convoys under fire in an area through which the Hamill convoy had to pass, the court finds that there is a genuine issue of material fact regarding whether the defendants had grounds to believe it was likely that the Hamill convoy would come under attack by insurgents.  Therefore, the court finds the defendants have not shown that as a matter of law that the event was both undesired and unexpected making it a compensable injury under the DBA.

*Lane*

      Reginald Lane was a driver in the Longstreet convoy traveling from Scania to Anaconda on April 9, 2004.  Dkt. 346, Ex. 258.  In the last leg of its journey, the convoy traveled from the west gate of Baghdad International Airport to Anaconda, through the area described as the "fire hole."  *Id.*  At 10:54 a.m. the convoy commander—Longstreet—sent a qualcomm that he was leaving Baghdad International Airport for Anaconda.  *Id.*  A review of the time line above demonstrates that at the time he sent this qualcomm, 3 convoys were already under serious attack in the area through which he would travel.  Despite this information, his convoy was allowed to depart.  At 12:30 p.m., the convoy was attacked by Iraqi insurgents.  *Id.*  For the same reasons the court found a genuine issue of material fact on the facts in the *Fisher* event, the court finds that there is a genuine issue of material fact regarding whether the *Lane* event was expected and therefore not an accident.  Accordingly, the court

34

finds the defendants have not shown that as a matter of law that the event was both undesired and unexpected making it a compensable injury under the DBA.

2.    <u>Willful Act of a Third Party</u>

Alternatively, defendants argue that the events qualify as injuries under the DBA because they are the willful acts of third parties against plaintiffs because of their employment.  The court disagrees. As discussed above, the willful act must be caused by the employees' occupation—in this case driving trucks.  Congress purposefully used the narrower phrase "because of their employment," and therefore the court will not read it broadly to mean "arising under and in the course of their employment."

The court finds that the record contains ample evidence that although the fact that the plaintiffs drove trucks on April 9, 2004 through areas known to be especially dangerous did increase the probability that they would be ambushed, the insurgents were targeting all Americans—and perhaps all non-Iraqi's—during that time.  Therefore, the drivers were assaulted not because they drove fuel trucks for the defendants, but because they were American on the first day of Arabeen, the one year anniversary of the United States' presence in Baghdad—a day that the insurgents had decided to target Americans.  The record contains substantial evidence to that effect.  In an April 2, 2004 email, Rex Williams—Regional Security Manager—attached a threat update discussing the threat of attacks by insurgents on coalition forces, including ambushing convoys and doing drive-by shootings on fixed points such as the Iraqi police stations.  Dkt. 341, Ex. 179.  Two days later, on April 4, 2004, Williams sent another threat update.  *Id.*, Ex. 187.  He listed attacks on coalition forces, Iraqi citizens applying for police positions, and government and infrastructure facilities.  *Id.*  Williams ended by recommending that all travel via road be limited to mission essential travel only.  *Id.*  Additionally, the detailed report of Good Friday's Battle for Abu Ghraib, Baghdad illustrates that insurgents were targeting primarily coalition forces.  Dkt. 345, Ex. 232.  Insurgents also fired on medical personnel and

35

a helicopter.  *Id.*  Simply put, the insurgents were fighting the Americans.  The 9th of April was a highly symbolic day for the insurgents.  The truck drivers were Americans in plain sight on April 9th. Therefore, they, among others, were attacked on April 9th, not because they were driving trucks for the defendants, but because they were Americans.

## II.    Defendants as a Single Entity

Defendants argue that all of the remaining defendant companies—Halliburton, KBRI, KBRSI, Brown & Root Services, and SEII[9]—should be considered the plaintiffs' "employer" for purposes of the DBA because they constitute a "single entity."  Alternatively, defendants urge the court to find that at least KBRI, KBRSI, and Brown & Root Services are covered by the DBA because they are signatories to the LOGCAP III contract and, therefore, are covered as "contractors" under the DBA. Plaintiffs, however, contend that only SEII, the company specifically named on the plaintiffs' employment agreements, is covered by the DBA.

The DBA does not define who is an "employer" for purposes of the Act.  The court, therefore, must once again turn to the Longshore Act for the definition of this term.  The Longshore Act defines employer as:

> an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

33 U.S.C.A. § 902(4).  Thus, by analogy, an employer for purposes of the DBA is someone whose employees are covered by the DBA.  The Fifth Circuit has recognized that there can be multiple "employers" under the Longshore Act and each company is, therefore, entitled to immunity under the

---

[9]The other defendants originally named in these suits—HESI, DII, and KBRII—were dismissed by the court's order of November 24, 2009.

Act.  *See e.g., Heavin v. Mobil Exploration and Producing Se., Inc.*, 913 F.2d 178 (5th Cir. 1990) (joint venture); *Oilfield Safety & Machine Specs., Inc. v. Harman Unlimited, Inc.*, 625 F.2d 1248, 1256 (5th Cir. 1980) (individual companies as "dual employers").

At least in a few instances, courts in other jurisdictions have found companies immune from suit under the Longshore Act because they operate as a "single entity."  *Claudio v. United States*, 907 F. Supp. 581 (E.D.N.Y. 1995); *see also Davenport v. M/V New Horizon*, 2002 WL 32098289, at *3–4 (N.D. Cal. Dec. 18, 2002); *Sweeney v. City of New York*, 782 N.Y.S.2d 537, 543–44 (N.Y. Sup. Ct. 2004).  The defendants cite *Claudio v. United States* as support for their single-entity theory.  In *Claudio v. United States*, the court found  the New York Workers' Compensation Law persuasive in holding that companies that operated as a single entity were immune from suit under the Longshore Act. 907 F. Supp. at 587.  New York Compensation Law made clear that immunity extended not only to parties of a joint venture, but also to "parent and subsidiaries, corporate affiliates, or general and special employers."  *Id.* (internal citations omitted).  This interpretation was in keeping with the purpose of the workers' compensation scheme which is to "assur[e] injured employees of certain compensation but also [to afford] protection to employers against excessive claims for injuries."  *Id.* at 588.  Additionally, the court noted, other federal schemes such as the National Labor Relations Act and the Sherman Act recognize that several business entities can be treated as a single employer under those acts.  *Id.*

Defendants contend that they are a single entity because (1) KBRI, KBRSI, and Brown & Root Services worked in concert with SEII in performing the LOGCAP III contract; and (2) all of the defendants are affiliated companies with an integrated corporate structure.  The companies that were parties to the LOGCAP III contract shared interrelation of operations, and operational losses and profits. This interrelation even included common DBA insurance policies that covered all parties to

37

the contract. Additionally, all of the defendants shared common management and ownership. Plaintiffs do not provide any evidence that the defendants did not act as a single entity. Rather, their argument rests on the reluctance that courts traditionally show to pierce the corporate veil and the fact that *Claudio* has not been adopted by this court or the Fifth Circuit. Plaintiffs do, however, concede that if "*Claudio* is correct, Defendants have the facts to satisfy it."

The court need not determine the applicability of the *Claudio* test, because binding Fifth Circuit precedent has held that two separate companies may both be an employee's employer for the purposes of the DBA by reason of their individual relationships to the employee. *Oilfield Safety*, 625 F.2d at 1256 (5th Cir. 1980). The *Oilfield Safety* court evaluated the employee–employer relationship between the employee and two completely separate companies using the "relative nature of the work test." *Id.* at 1253.

> In determining the existence of an employee-employer relationship pursuant to this test, one examines the nature of the claimant's work in relation to the regular business of the employer. This examination must focus on two distinct areas: the nature of the claimant's work and the relation of that work to the alleged employer's regular business. In evaluating the character of a claimant's work, a court should focus on various factors, including the skill required to do the work, the degree to which the work constitutes a separate calling or enterprise, and the extent to which the work might be expected to carry its own accident burden. In analyzing the relationship of the claimant's work to the employer's business the factors to be examined include, among others, whether the claimant's work is a regular part of the employer's regular work, whether the claimant's work is continuous or intermittent, and whether the duration of claimant's work is sufficient to amount to the hiring of continuing services as distinguished from the contracting for the completion of a particular job.

*Id.* at 1253 (internal citations omitted). No party briefed the court on the applicability of the facts to this case to the *Oilfield Services* test.

The defendants here have moved for summary judgment on the issue of whether all defendants are the plaintiffs' employer under the DBA. Because the act "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results," the court

presumes that all named defendants are employers under the act.  *Voris v. Eikel*, 346 U.S. 328, 333, 74 S. Ct. 88 (1953).  Normally, the employer bears the burden to show that it is *not* an employer under the act, thereby avoiding paying compensation.  Here, the employers argue that they *are* employers under the act.  This role reversal has the odd effect of placing the burden on the plaintiffs to demonstrate that the defendants are *not* employers under the act.  Under the summary judgment standards, the defendants' motion shifts the burden of proof to the plaintiffs to adduce evidence demonstrating that the defendants are *not* employers under the act.  As stated at the outset of this order "[f]or any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Avenell*, 66 F.3d at 718–19; *see also Celotex*, 477 U.S. at 323–25.  To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*, 475 U.S. at 587.  The plaintiffs have adduced no evidence to show that the defendants are not employers under the Fifth Circuit's relative nature of the work test as articulated in *Oilfield Services*.  Therefore, the defendants are entitled to summary judgment on this issue.  Accordingly, the court finds that all named defendants are employers within the meaning of the DBA for the purposes of this case.

**III.    28 U.S.C. § 1292(b)**

Finally, the court finds that the issue presented regarding the scope of the DBA's coverage discussed in Section I of the order merits interlocutory appeal as described in 28 U.S.C. § 1292(b).  Section 1292(b) provides in relevant part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and

that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b).  Essentially there are four statutory criteria that guide the court in deciding a § 1292(b) motion: (1) there must be a question of law; (2) it must be controlling; (3) it must be contestable; and (4) its resolution must speed up the litigation.  *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 675-76 (7th Cir. 2000) (Posner, C.J.); *see Marlbrough v. Crown Equip. Co.*, 392 F.3d 135 (5th Cir. 2004) (*citing Ahrenholz*, 219 F.3 at 676-77) (holding that whether there is sufficient summary judgment evidence is not a controlling question of law).  Unless all of the criteria are satisfied, the court "may not and should not certify [an order for appeal] under § 1292 (b)." *Ahrenholz*, 219 F.3 at 676.  A controlling question of law is an issue with a "statutory or constitutional provision, regulation or common law doctrine." *Id.*  Furthermore, the question must be an "abstract legal issue." *Id.* at 677.

The questions the court analyzed in Section I of the court's order may be the paradigmatic abstract legal issue for interlocutory appeal.  Whether the DBA covers only accidents, how to define an accident under the act, whether the willful act of a third party should be narrowly or broadly construed, or if all the foregoing inquiries should be subsumed in an intentional tort exception, the scope of which must also be determined, are all questions of law without regard to the facts of the instant case.  These questions are controlling as these three case will continue or end depending on their outcome.  That they are contestable goes almost without saying, as does the fact that the answer could completely terminate the litigation, thereby speeding it up.  For all of these reasons, the court on its own motion STAYS the case pending interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## CONCLUSION

Pending before the court are defendants' motions for summary judgment.  *Fisher* Dkt. 319,
*Lane* Dkt. 146, *Smith-Idol* Dkt. 105.   For the foregoing reasons, the motion in *Smith-Idol* is
GRANTED on all claims against all defendants.  *Smith-Idol* Dkt. 105.  The motions in *Fisher* and
*Lane* are GRANTED IN PART insofar as the court finds that all defendants are employers within the
meaning of the DBA and DENIED IN PART in all other respects.   Additionally, the court on its own
motion finds that the question regarding the scope of the Defense Base Act's exclusivity provision
merits immediate interlocutory appeal under 28 U.S.C. § 1292(b).  Therefore, those cases of which this
order does not dispose, are hereby STAYED pending a ruling by the Fifth Circuit on those issues
addressed by the court in Section I of this order.

It is so ORDERED.

Signed at Houston, Texas on March 25, 2010.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY

41